ENGLISH, *Ap't*, v. PORTER, *Adm'r.*

The statue excluding the testimony of a party when the other party is an administrator, applies when the matter in controversy is an account.

It also applies in the case of a claim against a partnership prosecuted against the estate of a deceased partner, and concerning which the surviving partner has testified.

Where one party is an administrator, the other cannot make himself a competent witness by his own testimony.

APPEAL by the plaintiff from the commissioner on the estate of the defendant's intestate, Albert J. Pushee. Facts found by a referee. The deceased and his brother, Alfred W. Pushee, had been partners in business up to the time of Albert's death. The plaintiff's claim consists of an account against the firm. The defendant filed a counter claim against the plaintiff consisting of an account in favor of the firm and a note for $75 belonging to the firm.

The plaintiff was permitted, against the objection of the defendant, to testify to conversations which he claimed to have had with the surviving partner, or with the defendant's intestate when the surviving partner was present, in reference to said note. There was no evidence that the surviving partner was present when the plaintiff had the conversations with the deceased, except the testimony of the plaintiff himself. The court ruled that the plaintiff was not properly admitted to testify, and the plaintiff excepted.

*J. M. Shirley*, for the plaintiff. As to the set-off, the administrator was in law the plaintiff, and this plaintiff the defendant. A set-off is a statutory cross action, and the plaintiff, as to those items, had all the rights of a defendant. *Chandler* v. *Drew*, 6 N. H. 470, 473, 474; *Varney* v. *Brewster*, 14 N. H. 49, 54, 55; *Chase* v. *Strain*, 15 N. H. 535, 540, 541; *Eastman* v. *Holderness*, 44 N. H. 19. And it is well settled that in these proceedings he has the benefit of every equitable principle which prevailed in the old action of account at law or in any matter of accounting in equity. *Copp* v. *Henniker*, 55 N. H. 209, 210, 212, 213; *King* v. *Hopkins*, 57 N. H. 356; *Perkins* v. *Scott*, 57 N. H. 55, 81; *Sargent* v. *Putnam*, 58 N. H. 182. The statutes which the administrator invokes in this case (*c.* 228, G. L.) are clearly enabling and not disabling acts. *Dyer* v. *Stanwood*, 7 N. H. 261; *State* v. *Flanders*, 38 N. H. 328, 329; *Rich* v. *Flanders*, 39 N. H. 317, 328, 329; *Clements* v. *Marston*, 52 N. H. 37, 38; *Stewart* v. *Harriman*, 56 N. H. 25, 33; *Day* v. *Day*, 56 N. H. 316, 318; *Babbitt* v. *Morrison*, 58 N. H. 419; *Peirce* v. *Burroughs*, 59 N. H. 512.

The plaintiff, at least as to the charges in the set-off, was a competent witness under the English practice, either at law or in equity.

We cannot go into a discussion of the whole subject, but will give a brief *resumé* of the criminal law, and a summary of that in relation to accounting, in support of our proposition.

The English criminal practice at its different stages may be summarized as follows: The accuser, whether the prosecution was public or private, always testified as of right. So long as compurgation lasted, which was probably until shortly after the Norman

conquest, the accused first entered his plea of "not guilty" and swore to it. The question whether he was of good character was next determined. When found "oath-worthy," he was entitled to compurgation. He then produced eleven witnesses who testified that they believed him innocent. Thus, with the aid of the eleven compurgators, the testimony of the accused was not only competent, but was conclusive. 1 Steph. Cr. L. 70–73.

Next came trial, not by a jury of jurors, but by a jury of witnesses. This was probably the outgrowth of the practice of compurgation and of the Norman proceedings by inquest. 1 Steph. Cr. L. 425, 426 ; 3 *ib.* 241. This necessarily was a jury from the vicinage. Those who knew nothing about the matter were excluded from the jury. Out of this in some way arose the right of challenge. At first the accused seems to have exercised the power of challenging those of the panel who knew nothing about the matter. Then both exercised it, and then the prosecutor alone. The form of trial was notoriously a species of debate between the accused and the witnesses. In this way the entire case for the prisoner, including his own statement, got before the jury ; and there are one or more cases in the year-books where the presiding judge repeatedly took, in this running debate, abrupt oral findings of the jury on questions raised by the prisoner. Trial by those who knew all about the case, became by slow degrees a trial by those who knew nothing about it.

The prominent feature of criminal trials down to the period of the civil wars was the examination of a prisoner after his arraignment. After the practice was established of taking his examination in writing, as a rule, his deposition was the first testimony given to the jury by the prosecution. As a rule, before counsel were allowed him the prisoner gave his own statement to the jury, and it was weighed by them for what it was worth. After that, except in a few instances, it was done by the prisoner's counsel. Am. Law Rev., March–April, 1884, *pp.* 281, 282.

It is not true that the common law prohibited the plaintiff from testifying in all civil suits outside of matters of accounting ; but the rules in matters of accounting, both at law and in equity, though peculiar, were much broader and more liberal than in anything else. Nobody knows the origin of the action of account. It arose at so early a period that only its outlines can be discerned in the dim haze of legendary history. It was abolished in the mother country in 1833–'34. It was in pristine force and vigor when New England was colonized, and has long been recognized in New Hampshire.

In this action two courses were open to the defendant,—first, after the plaintiff had proved his case by consistent witnesses, the defendant, by taking his oath, being found "oath-worthy," and producing his eleven compurgators, was discharged, for this was equivalent to a verdict of acquittal. The testimony of the defendant was not only competent, but conclusive. But by the ancient com-

mon law a defendant executor or administrator could not discharge himself in this way, although any other defendant of good repute could. This rule in relation to executors, etc., was changed by statute one hundred and eighty years ago. By the second course, the defendant, if he saw fit, could allow judgment *quod computet;* and then the matter was determined by auditors assigned by the court, before whom both parties could testify under oath.

The act of 4 Anne, *c.* 16, *s.* 27, after extending the remedy of accounting to executors, etc., provided,—"And the auditors appointed by the court where such action shall be depending shall be and are hereby empowered to administer an oath and examine the parties touching the matters in question." 3 Stat. at Large 487 (see comment on this statute by Mr. Finalson, in his learned and elaborate note to the common-law procedure acts, 333); Chit. Gen. Pr. 22.

The action of assumpsit was liberal and remedial. It was a wise invention; but its beneficent purposes were frustrated, as those of every statute of jeofails have been for centuries. In *Scott* v. *M'Intosh,* 2 Camp. 238, 239, which was assumpsit to recover the balance of an account for several thousand items, Lord *Ellenborough* held that account and not assumpsit was the proper action, for reasons which would seem unanswerable; but in *Tomkins* v. *Willshear* and *Arnold* v. *Webb,* 5 Taunt. 431, 432, the court decided exactly the contrary.

Accounting in equity arose at a much later day than at law, and the reason assigned by Blackstone is, that "though the defendant answers upon his oath, yet such oath is not conclusive to the plaintiff; but he may prove every article by other evidence in contradiction to what the defendant has sworn." 3 Bl. Com. 348. It was, of course, impossible in proceedings at law before auditors, or in equity before a master, to get rid at once of the conclusiveness of the defendant's oath, which had been so marked a feature of wager of law. For reasons that are now entirely unknown as to the sum limited, the oath of the parties, or at least that of the defendant, in the taxing-master's office was conclusive where each item did not exceed forty shillings, and was competent for larger sums in special cases. The practice before auditors was well understood before the statute of Marlbridge, passed in 1267, and that of Westminster, passed in 1285, regulating the proceedings in actions of account and before auditors. In *Robinson* v. *Cumming* (A. D. 1742), 2 Atk. 410, the lord chancellor said,—" The exception must be allowed, because where at law a person upon an account is allowed sums under 40s. on his oath, it is not sufficient that he swears to his belief only, but he must swear to the fact: so in directions under a decree, that the person upon an account should be allowed such sums as he swears he has actually expended : it is not sufficient, as in this case, that he believes he paid them, but he must peremptorily swear to the fact." Here the oath of the party

15*

was held to be conclusive as to items under forty shillings in chancery, because it was so at law. See *Plampin* v. *Betts* (A. D. 1684), 1 Vern. 271, which goes distinctly upon the ground that the plaintiff's oath as to such large sums should not be conclusive as in wager of law.

In *Childrens* v. *Saxby*, 1 Vern. 207, some of the bailiffs who served the execution took away £150 from the plaintiff's house. The order was, that the defendant should make good this money to the plaintiff, "and should satisfy all other damage which the plaintiff would swear he had sustained." This order was affirmed by the lord keeper, who said he thought it "an idle practice in the court to put a thief to his oath to accuse himself, for he that has stolen will not stick to forswear it." Here the plaintiff's oath was held to conclude as to hundreds of dollars.

At the Michaelmas term of 1684, in *Anonymous*, 1 Vern. 282, it was held that "sums under 40s. to be allowed the party on his oath, but then he must in his affidavit mention unto whom paid, for what, and when."

In *Whicherly* v. *Whicherly*, 1 Vern. 470 (A. D. 1687), the report says,—"The court being informed that the course of the court was that an accountant was to be allowed on his own oath all sums not exceeding 40s. each, so as the whole was not above 100*l.*, declared *that* rule seemed very unreasonable and would consider how to rectify it."

In *Marshfield* v. *Weston*, 2 Vern. 167 (A. D. 1690), it was held that "in an account between the plaintiff, a gardener, and the defendant, a seedsman, though the defendant be allowed sums under forty shillings upon his oath as to his seeds sold and delivered, yet the plaintiff shall not be allowed anything upon his oath as to trees that he sold and delivered and the like." Here the defendant's oath was held conclusive, and the plaintiff's not.

In *Morley* v. *Morley*, 5 De G., M. & G. 610 (A. D. 1678), it was proved that the trustee was robbed. To discharge the defendant "the sum of £40 was proved only by the defendant's oath," and the order was "oath of the party admitted in proof of amount." Here the oath of the party was held conclusive as to the amount, but not as to the fact of robbery. This case was extended and followed in this state in *Stevens* v. *Gage*, 55 N. H. 175.

But in the great case of *John Gyffords* v. *Undertakers of Iron Works*, decided in October, 1655, and in which he sought to discharge himself by his "broad book," &c., for certain sums, and by his own oath as to certain other large sums, the decision was adverse. "The quæstion being put whither Mr. John Gyffords oath shallbe accepted as an evidenc to cleare his accompts in reference to the iron workes, as the sajd accompts now stand, itt was resolved on the negative." 4 Mass. Records, part 1, *pp.* 244, 252.

In *Holstcomb* v. *Rivers*, 1 Eq. Cas. Abr. 11, "an account of fourteen years standing was admitted to be proved by oath." The

ancient "course of the court," by which parties were allowed to charge and discharge by their oaths as to items not exceeding 40s., and for larger sums when the principal question was as to the amount, and under other special circumstances, instead of being ordered to "surcharge and falsify"—in other words, be put to proofs—must have been well known to the colonists, who for generations landed on these shores.

The books are so full of references to the suppletory oath in relation to account-books, that no one would suppose that the term had any reference to anything else, whereas the two had no natural, legal, or historical connection. The oath was the creature of the civil law. It was of two kinds, and administered by the judge upon his own motion to satisfy his conscience, under the following circumstances: 1. "The proper case for deciding by the oath of the parties is, when the proof is already considerable and not quite complete." 1 Ev. Poth. 576. 2. " This oath is administered whenever the plaintiff has lawfully established his right to the restitution of a thing, and it only remains to ascertain the sum in which the defendant ought to be condemned for the non-restitution of things, the value of which can be known only to the plaintiff. The judge in this case decides upon the plaintiff's estimate of the value, having first administered the oath that it shall be fairly and conscientiously made." 1 Ev. Poth. 578. If the judge tendered the first oath to the plaintiff or defendant, and he refused to take it, it was in general fatal to his case. But the second oath did not always conclude as to the *amount*.

The character and weight of these oaths can be distinctly traced in the practice in the English court of chancery, in the cases cited and others, modified as to small sums (and larger sums under exceptional circumstances) by the principles of wager of law. Besides, our ancestors after a time imported this rule into the law of account-books, and liberalized it by restricting the 40s. limitation to charges for cash only, and allowing the plaintiff to take the suppletory oath as a matter of right. *Shillaber* v. *Bingham*, 3 Dan. Abr. 321, 322 (1790); *Union Bank* v. *Knapp*, 3 Pick. 109; *Burns* v. *Fay*, 14 Pick. 12; *Bassett* v. *Spofford*, 11 N. H. 170; *Hall* v. *Miller*, Quin. 252 (1767); *Box* v. *Welch*, Quin. 227 (1766).

Account-books verified by the suppletory oath of the party were entirely unknown in the English law (2 Ev. Poth. 187), though as we have seen, under special circumstances the books themselves sometimes became material in proceedings in chancery. It is true that Judges *Sharswood* and *Washburn*, and all our courts and text writers, agree with one voice that our practice in this respect is a colonial invention. 3 Black. Com. 368, *n.* 19; Wash. Jud. Hist. Mass. 55; *Cogswell* v. *Dolliver*, 2 Mass. 221; *Prince* v. *Smith*, 4 Mass. 457. This, however, was a palpable error. They took it from the civil law as in use in France and in the low countries (1 Ev. Poth. 483–485), and modified it by their own usages

and legislation. Mr. Washburn (Jud. Hist. Mass. 56) says,—"In 1654 the court, 'taking notice of the imperfect matters that are tendered many times for evidence before the judges with reference to shop books and writings of like nature,' passed an order requiring books to be kept in a particular form in order to be admissible as evidences, and 'for any wares sold' the judges would not be willing to take the oath of the plaintiff on his own case unless it be 'to the truth of the whole book,' *except* under certain limitations specified in the order."

In 1682 Plymouth adopted the following, which was probably, like others, taken largely from that which had for years prevailed in the Bay colony: "It is therefore enacted, that all and every merchant, shop-keeper, dealer, &c., shall keep a book of their dealing and trading, fairly writing down therein both debt and credit; and the said merchants, their factors or servants, or any of them that shall deliver any such wares or merchandise, making oath that the said book of accounts is true both for debt and credit, such book of accounts shall be held sufficient in law for the recovery of any debt within four years after the delivery of any such goods. But if the defendant will take his oath that he had not those goods charged in the book or account, or that he hath paid for the same, then the case shall be tried and determined according to the best and strongest presumptions the parties concerned shall produce." XI Plymouth Col. Rec. 255. It is worthy of note that our first code of laws—the Cutt code—was taken almost bodily from those of Plymouth colony. The action of book debt was repealed by the Bay colony on May 28, 1679; and the subsequent law and practice in Massachusetts was unknown here until long after the Revolution, when it was imported here by an eminent judge, who was a Massachusetts man in everything except the accident of birth.

Actions upon "an account" and for "book debt" and "book account" and for "not accounting," or "suits for settlement," as they were termed, were known here at a very early day. The common form of an action of book account here in 1688 was by adding to the common form for goods sold and delivered, the words "as by the said plaintiff's book of account relative thereto being had more particularly appears." Smith's MS. "Old Records" 50. See, for forms of declarations used in several cases, &c., *ib.* 49, 65, 66, 67, 68, 74, 118.

We now come to two important causes. 1. In 1743–'5 the great case of *Sherburne* v. *Thompson* ran the course of our courts. It was assumpsit for book account, for goods sold by a merchant in Boston to a merchant in New Hampshire. The papers are now in the files of the old court of appeals at the state-house. The plaintiff, under the statue which we have copied, and which was then and ever since the common law of New Hampshire, copied off his bill, took his book with him, and went before a jus-

tice of the peace in Boston, who administered to him the proper
oath, compared the book with this long account, and certified at
the end of the account that he had done so; that the two tallied
except in a single item stated;—and in this way the plaintiff proved
his entire case.   2.  The suit of *Moffat* v. *Livius*, entered 1768, was
also an action for not accounting for a voyage, and was brought by
one of several owners.   A variety of questions was raised, and
among them this : " The account is not attempted to be proved by
the appellant's oath, or by the oath of any clerk of his, but the at-
torney only swears that one part of the account is fairly transcribed
from the appellant's books."   This objection after due argument
was overruled.   Similar suits were brought until long after the
Revolution.

From the hour of the union with Massachusetts until the present
time, both parties, in matters of accounting, have always been al-
lowed to testify in matters before auditors.   This was notoriously
done here before the Statute of Anne, and it is entirely immaterial
whether it was done by virtue of the statute or practice of the Bay
colony, which became our common law, or by the ancient common
law ; and it is equally immaterial whether it has been done since
the Statute of Anne by preëxisting practice under that statute, or
under some subsequent law or practice.   The fact is enough.   By
virtue of the statute, the defendant, sued upon an account or in any
matter of accounting, had the right to testify.   All this shows con-
clusively that the provisions in *c.* 228, Gen. Laws, upon which
the counsel for Mr. Porter has always and solely relied, must be
laid out of the case, for they do not apply to matters of account
or accounting, either at law or in equity.

This leaves but a single question : What good reason can be
given why the court should revise and reverse the discretion of the
referee ?   1.  The presumption is, that the referee was right in the
exercise of his discretion.   The burden is upon those who assail it
to show that he was wrong ; and this would have been so under the
statute.   *Moore* v. *Taylor*, 44 N. H. 375.   The same referee, in the
case of *Stevens* v. *Chase*, made certain rulings in the exercise of his
discretion.   The court presumed them correct, and refused to revise
them.   2.  A divided court held that a party under the statute re-
ferred to was not a competent witness to show himself a competent
witness ; but the same court, under a statute similar in principle,
unanimously held exactly the other way.   *Corson* v. *Murinane*, 51
N. H. 92.   But however this may have been under the statute, it
is clear that no such rule ever existed under the common law of ac-
counting, either before auditors or elsewhere, and for that purpose,
at least, English was properly admitted to testify.

*Drew, Jordan & Carpenter*, for the defendant.

BLODGETT, J.  That the plaintiff could not make himself a com-
petent witness by his own testimony, and that, in ordinary cases

coming within the statute exception (G. L., c. 228, s. 16), the living party cannot testify to transactions known only to himself and the deceased, are propositions established by repeated decisions of this court. And upon the question of injustice we find nothing in the reported facts which distinguishes this case from the numerous other cases in which the living party has been excluded as a witness.

But it has been argued at great length, and with much ability, that the exclusion does not apply in matters of account. We do not assent to this proposition; and besides, *Moore* v. *Taylor*, 44 N. H. 370, and *Fosgate* v. *Thompson*, 54 N. H. 455, are authorities to the contrary. But if the proposition were true, and it be conceded that the rights of the parties are to be governed by the rules once applicable to the obsolete common-law action of account, it does not aid the plaintiff, because, in matters of accounting at common law, in the language of *Allen*, J., in *Page* v. *Whidden*, 59 N. H. 511, " The admission of a party to testify was not a matter of right in any case, but within the discretion of the court; and when the discretion was exercised by masters in chancery in equity proceedings, the discretion was subject to revision by the chancellor. The practice of allowing parties to be examined and to testify for themselves was resorted to with great caution, and never unless, under the peculiar circumstances of the case, justice could not be attained without it. It was permitted in no case where from the position of the parties an unfair advantage would be given by it to one party over the other (3 Gr. Ev. 338) ; and when the fact in question occurred in the presence only of the plaintiff and a deceased partner of the defendant, the examination of the parties was held improper as calculated to give the plaintiff an unfair advantage." Therefore, if the common-law exception in matters of accounting is applicable, there was no error in the ruling at the trial term that the plaintiff was not a competent witness.

It has been further contended, that partners are each the agent of the other, and therefore that an arrangement entered into with one partner about the firm business must be considered as an arrangement with the others, and that consequently the statute does not apply, because the claims here on both sides being partnership claims, the plaintiff is the real party on one side, and the Pushee firm, and not an individual member of it, on the other, and " so the case stands just as it would if the plaintiff had sued the firm prior to the death of any member, and the deceased Pushee had died as he did, and his administrator had come in as he did and sought to defend the suit, first, by setting up matters in defence, and second, by instituting a suit in favor of the firm against the plaintiff by the statutory action known as set-off;" and that to exclude the plaintiff as a witness the whole firm must be dead.

Concede the argument to be sound, the conclusion does not follow. The sole design of the statute was to place parties to suits upon equal footing. *Moore* v. *Taylor*, 44 N. H. 375, and numerous

subsequent decisions.   Hence it is held, that although excluded by the literal terms of the statute, the living party may testify to matters not known to the deceased, because in such a case there is nothing unequal or unjust in allowing the survivor to testify; and for the same reason it is held that he may not testify where the deceased had personal knowledge of such matters.   Tested by the standard of equality (and no other can be allowed), the plaintiff was not a competent witness as to the disputed note concerning which the deceased must have had full knowledge, and might, if living, have been a witness, for it would be unequal and unjust to permit the plaintiff to give his version of the transaction when the lips of the only other party having knowledge of it are closed in death.   And we do not see why the controlling principle of equality is altered by the fact that the transaction was between the plaintiff and the Pushee firm.   The only member of that firm having cognizance of the matter being dead, the case comes within the terms of the statute, and we think it comes within its spirit also; for to allow the plaintiff to give his account of the vital fact in issue, without the possibility of contradiction, would reverse the uniform construction heretofore given to the statute, and let in the very evils against which the legislature intended to guard.

The same conclusion follows if a narrower and technical construction be given.   The phrase "neither party shall testify," &c., may be fairly held to mean the legal party to the action.   In fact, this is the common meaning of *party* in legal instruments and proceedings   In this view, the plaintiff's action cannot be regarded as one against the firm.   His case is an appeal from the decision of the commissioner on the estate of the deceased Pushee, disallowing his claim against that estate alone.   The plaintiff is one party, and the administrator, representing the heirs and creditors of the deceased, is the other party.   No other parties appear on the record, and no others are before the court, or will be affected by the result.   Should the surviving partner be sued hereafter by the plaintiff for the items claimed here, the judgment in this proceeding would not even be evidence against him.   Legally, therefore, the administrator is to be regarded as the sole defendant, and the case stands as it would if the matters in dispute were based upon the individual contract of the deceased with the plaintiff.

The remaining exception to the disallowance by the referee of the items for pasturing requires but brief consideration.   It is sufficient to say, that on the reported facts the law does not imply a promise to pay for the pasturing (*Bank* v. *Getchell*, 59 N. H. 281, 285), and therefore, the only question raised being one of fact, the exception will not be considered at the law term.   *Fuller* v. *Bailey,* 58 N. H. 72, 7 1; *Lefavor* v. *Smith, ib.* 125.

*Exceptions overruled.*

SMITH and CARPENTER, JJ., did not sit: the others concurred.